Our next case is Servant Health, LLC v. United States, docket number 22-2193. Attorney Carolyn Thompson. You have reserved four minutes of time for rebuttal. That's correct, Your Honor. OK. You may proceed. Thank you, Your Honor. May it please the court, Carol Thompson on behalf of Appellants American Medical Equipment, noble attorney, Transcendence, and Servant Health. And we are also joining this courtroom today by Servant Health and Transcendence. Since Fleshinger in 1968, this court has refused to sanction the abdication of the responsibility to exercise discretion when a contract requires it. The FARS termination for cause clause requires the exercise or, I apologize, requires the exercise of discretion. That clause, I apologize, Your Honor. May I have a sip of water, please? Thank you, Your Honor. That clause requires the exercise of discretion. And that clause was present in every single one of Appellant's contracts. And even if it wasn't present in every single one of Appellant's contracts, then it would have been read into the contracts by virtue of the Christian doctrine, which stands on the principle that a clause with such ancient lineage, reflecting deeply ingrained public procurement policy, and applied to contracts with the force and effect of law, even when omitted, should not be materially modified or summarily rendered meaningless without good cause. What support do you have that the contract officer did not exercise discretion? In every single one of Appellant's cases, he used either the language from the statement of work, which said that if you fail to deliver within the 45-day strict deadline, you will automatically be terminated for cause. And he also relied on the extra contractual communication of there won't be any substitutes granted, and the packaging for the gloves has to match exactly with what was being submitted in the offer. So in every single one of the Appellant's cases, it was that either solicitation language or the extra contractual language that the contracting officer then relied upon in terminating the contractors for cause. You would agree that all the contracts include a firm delivery deadline, right? They did, Your Honor. But prior to terminating a contractor for cause, the contracting officer is required to, one, engage in that discretion to determine if termination at that time is appropriate, whether there is excusable delay that is occurring, or whether or not there were conforming products that require further testing or inspection by the contract officer. Why didn't you protest that decision at that time? The contractors did not protest the decision or the solicitation. However, the solicitation was also adopted as the contract itself. And then in issuing the contract, the contracting officer further expressed, again, extra contractually, that any delivery past the 45-day strict deadline was going to automatically result in termination. But going back to the point that prior to terminating for cause, a contracting officer must exercise discretion. In this case, the contracting officer, instead of determining, again, whether or not maybe giving a little bit of an extension, especially in the case of American medical equipment, or actually inspecting the gloves in the case of Noble and Servant, where there were deliveries that had occurred, at no point did the contracting officer actually exercise that discretion. To give you, does exercise of discretion require accommodating a delay? It doesn't require, Your Honor, it doesn't require accommodating a delay. But I think it requires the contracting officer looking at the circumstances of the particular delay and then determining whether or not, one, it's excusable. So in the instance of AME, the port that the gloves were being shipped out of in China, there was a sudden outbreak of COVID. Now, granted, this was during the pandemic, and there were certain outbreaks at various points at different places, but that particular port experienced an outbreak, and so they shut the port down for a period of time, which resulted in a delay of the shipping. But the contracting officer explicitly said, I'm not going to even consider that as a potential excusable delay, which would have been a violation or an abuse of that contracting officer's discretion. How does that interplay with the on-hand requirement, which I believe was also in place? Yes, Your Honor. So the contract or the solicitation did say on-hand, but at no point in the solicitation was on-hand defined. It didn't say that had to be within the United States. It didn't say that had to be in a particular facility. To that point, each one of the appellants in their offer noted that the gloves that they were procuring were all from overseas. So are you interpreting on-hand as encompassing it being overseas? Well, with each one of the appellants, they did state in their offers that the gloves were overseas. Specifically, Noble and Amy, they put that it was located in China. Servant Health indicated that it was located in Thailand. And the contracting officer saw that in the offer, and still knowing that those gloves weren't located within the continental United States, still offered the award. It sounds like you're shifting the burden here. Shouldn't your clients have foreseen that there's delay due to the COVID crisis? And why did you agree to have delivery by a certain date, knowing that the supply chain was already at peril? You're correct, Your Honor. And many of my clients are the appellants. They had prior government contracting experience. And so relying upon that prior contracting experience, knowing that there have been instances maybe where they might have had delay, and they worked with the contracting officer and being able to excuse that delay, they believed, based on assurances that they had with their particular suppliers, that they were going to be able to deliver that product within the 45 days. That's like taking a risk, right? Admittedly, it is taking a risk, Your Honor. They lost. They got to pay now. They lost. They guessed wrong. They said we're going to deliver by this so-and-so date. And yet, they didn't. Yes, Your Honor. But at the end of the day, what I find concerning about this case is for a contracting officer to be able to write into a statement of work that no matter what, no matter what the circumstances, I will not exercise any discretion. I'm going to automatically terminate you for cause. That's concerning, because one, not only does it not square with Schlesinger in this court saying that it will refuse to sanction a complete abdication of that responsibility, but two, if this lower court allows or if this court allows the lower court's decision to stand, then it gives contracting officers in the future the opportunity to write whatever they want into a statement of work that then either modifies or removes a requirement based on the FAR. And again, these contracts included the termination for cause clause, which does require the exercising of discretion. So if a contracting officer purposely Do you have access to the appendix? I apologize, Your Honor. Do you have access to the appendix? Yes, Your Honor. OK. Can you turn to page appendix 277? I apologize, Your Honor. I do not. OK. Well, at least in the appendix on page 277, it mentions that on hand, it has a parenthetical, is described as in stock and available for immediate delivery. So I'm not sure, and this is just circling back to my colloquy with you encompassing something that would be overseas. Yes, Your Honor. And the only thing that I can point to is, again, with each one of the contractors putting in their offer that the gloves are located in a foreign country. So specifically, Transcendence stated that theirs was located in China. And that's at appendix 1626. Servant Health stated that theirs was located in Thailand. And that's at appendix 263, 265. OK, and I won't belabor the on hand point. Maybe turning to your other argument about allowing substitutes. Do you have any contractual language to point to to support the allowance of substitutes? No, Your Honor. For the allowance of substitutes, we would point to the fact that these particular contracts were for brand name or equal product. Meaning there were a set number of requirements listed in the solicitation for the gloves that as a part of the offer, each one of the contractors had to state how their gloves met each one of those requirements. So it wasn't for a particular brand name. The VA wanted gloves that met those particular requirements. So in the instance of Noble and Servant Health, when they learned that their supplier was no longer able to provide the gloves that they were contracting for, they pivoted. Well, especially Servant Health, they pivoted to another supplier. But it was the same with both Noble and Servant Health. They delivered gloves that were from the same original equipment manufacturer that met the same requirements that were listed in the solicitation. And I would also point as a part of the abuse of discretion is at no point, despite there being the inspection clause listed in the contract, at no point did the contracting officer actually open the boxes and inspect the gloves to determine whether or not the delivered product met the requirements. Did you submit any documentation to support showing that the delays were caused or related to pandemic-related restrictions or something like that? Yes, Your Honor. It was the various email correspondence between the respective contractors and the contracting officer. So the various correspondence between Servant Health and the contracting officer, A&E and the contracting officer, Do you have appendix pages to identify? Yes, Your Honor. And also, while you're looking for that, what is the support in the record that the gloves are the same? You mentioned that as part of your argument in response to my questions on substitutes that they were also the same. So I'd love appendix pages on both. Yes, Your Honor. And if you don't have them right now, you can always do it when you get back up on rebuttal. Yes, Your Honor. That may be a better use of time, Your Honor. Again, I want to reemphasize the point that at the end of the day, discretion is required. It has been recognized within the circuit at the Court of Federal Claims that a termination for default essentially is a nuclear option for a contractor. And a large reason for that is, one, getting the negative performance evaluation reports, which the contractors in this case did receive, that impacts their ability to engage in any further contracting with the government. And when you have instances such as Transcendence or Servant Health or AME who had, or I'm sorry, or Noble, who had extensive government contracting experience, the negative CPARs that they received are now impacting their ability to continue contracting, and then has a direct impact on their ability to survive as a small business. Counselor, I think you're into your rebuttal time. Oh, I apologize. Yes, Your Honor, so I will sit down. Before you sit down, I wanted to point something out, page 29 of your blue brief. Do you have that? Yes, Your Honor. Yes, Your Honor. OK, and there's a block quote there. Yes, Your Honor. And you quote that, you say, it's neatly summarized by this circuit. But that quote is not of this circuit. That's a quote from the Court of Federal Claims. So I'm going to, I ask, I point this out just to ask you to be careful with your citations. Yes, Your Honor. And also, there's certain language in your brief that I take to be uncivil and unprofessional. Your characterization of intent, of mens rea on part of the contracting officer, and I beseech you to not use that type of language in your briefings before this court. OK? Understood, Your Honor. Thank you. Thank you, Your Honor. Counselor Geddes, is that correct? Geddes, yes. Thank you. OK. Good morning, Your Honors. May it please the court. All that the VA attempted to do in this case was ask for gloves on hand within 45 days. And as part of that request, it asked the contractors show them images of the specific gloves that intended to provide with information about who the distributor was, who the manufacturer was, what the product number was, so that VA could vet that specific information and confirm that these were legitimate gloves that matched the specification. This was at a time when the market was flooded with counterfeit goods, so-called gray market goods, and other issues such as that. Plaintiffs are asking. There seems to be a pattern in the way that the marketplace works. And it's a pattern that I recognize in other sectors as well, where you have an OEM manufacturer, let's say in China or Thailand or somewhere, that manufactures certain products. You may have three different suppliers that go to that manufacturer and purchase from that manufacturer and put their own label on there. But yet, those are the gloves that meet the specifications that are requested for. Why isn't that the case here? It's true that that is sometimes how the market works and that the fact that the labeling is different or a different distributor is used does not necessarily mean the gloves don't match the specifications. But the VA is entitled to determine what it wants in its contract and to define what it considers to be conforming goods. And in this case, yes, it asked for a brand name or the equivalent, but it also asked contractors to provide specific information up front about which specific distributors they were using, what specific branding they would be providing. So that's not to say that by providing something with a different label, the gloves necessarily don't meet the specifications, but they are non-conforming goods because the VA had vetted the particular distributors identified and the particular packaging identified. That's because unauthorized distributors might attempt to sell goods, might attempt in that case to sell counterfeit goods. And the solicitation and contract were clear that one of the goals of these requirements was to avoid counterfeit or gray market goods. So nobody was saying that gloves in different packaging could not have been from the same manufacturer or could not have met the specifications. It's just that that was not what VA asked for. VA reasonably asked for gloves on hand for information about those gloves and for the gloves provided to match so that VA could vet that information. And what's the understanding, your understanding behind gloves on hand? Is that at the warehouse down the street or at the warehouse in China? What does that mean? Yes, Your Honor. So as this court has pointed out, there is language, I believe it was in a series of questions asked where it said in parentheses next to gloves on hand that they would be in stock and available for immediate delivery. Whether gloves located in China would be considered on hand is a closer question. But what I think this indisputably means is gloves that exist, which was not the case for two of the plaintiffs who began manufacturing gloves after they were awarded the contract or gloves that the contractor had some right to deliver to VA, which was not the case for plaintiffs who said, actually, we can't get the gloves we thought we were going to get. We're going to try and find other suppliers, try and find alternatives. Gloves on hand meant gloves that were in the control of the contractor to provide to VA. Now, maybe they had some agreement from a... In control of the contractor? Is that what you said? Well, at the very least, they should have the right to ship those gloves to VA. Obviously, the fact that some third party has gloves does not mean that they are on hand. Perhaps they had some agreement from distributors and believed that the gloves were on hand and the distributors backed out of that obligation. Frankly, that's an issue between the contractor and that distributor. The VA pretty reasonably expected these to be gloves that the contractor had the power to deliver to VA. And in most of these cases, that turned out not to be correct. In the only case where they did not try and... Or yeah, in the case of... Yeah, they were either trying to manufacture them or trying to secure them from alternative suppliers. So that clearly violates the definition of on hand. Whether... Are there any evidence in the record that the gloves were equivalent or equal? The plaintiffs did try to provide some documentation at the points where they were offering substitutes. As this court has pointed out, there was no contractual language saying that substitutes had to be accepted under any circumstances. There's not an analog to the excusable delay clause in this case. But yeah, so for instance, Transcendence tried to offer a different sort of glove from a different manufacturer called ATX. In support of that, they submitted a letter from ATX saying it was, quote, either the manufacturer, authorized distributor, authorized subdistributor, or title holder, which VA reasonably found not to be particularly reassuring. Servant Health said that it was going to provide Dong Thai gloves through distributor SGH. When there was no reference to SGH on any of the packaging, Servant Health first provided a series of communications suggesting that they were in fact SGH gloves before ultimately admitting that they were from alternate suppliers, but saying that they were still from Dong Thai. I don't remember how strong any attempt at documenting that they were still Dong Thai gloves was, but at that point when they admitted that they were using a different distributor, as I've said, VA asked them to provide that specific information upfront so it could vet the distributors and ensure that they weren't counterfeits. Noble Attorney did provide an email from the manufacturer asserting that the gloves still match the specifications even though they were different product numbers and different packaging. But again, VA had the right to require the parties to provide the gloves that they had assured VA it would provide with that upfront documentation. So I guess my answer is it varied, but the documentation was often not very strong or convincing, and VA had defined the gloves it was requesting based on the information that the parties provided upfront. So these were substitute goods. VA had no obligation to accept them, and VA ultimately decided not to accept them. With respect to the 45-day deadline, which was the other cause for breach in most cases, VA was very upfront throughout the entire process that the 45-day deadline would be strictly enforced. Plaintiff appears to be focusing primarily on this argument they've made that by saying it was a strict deadline and warning plaintiffs upfront about the consequences of breach, it was actually breaching the contract or abusing its discretion. Frankly, it seems like plaintiffs are suggesting it would have been better for VA to hide the ball and say, well, I don't know, maybe we'll give you an extension, but we won't know until we get there. Clearly, VA was only trying to provide more information and be as clear as possible by saying at every step of the way, we don't intend to give any extensions. I don't believe they ever used the word automatically, which plaintiffs keep saying that it would automatically be terminated. They simply said that they don't anticipate granting any extensions, and the expectation was that the contract would be terminated for cause. But the- What about the impact of the pandemic? And would that provide a reason for excusable delay? So excusable delay would be unforeseen circumstances. So in this case, we were well into the pandemic. The whole purpose of this solicitation was to get gloves in pandemic circumstances. So the fact that a pandemic was happening alone would certainly not constitute excusable delay. And the contracting officer reminded the parties of that repeatedly. This is a disruption to shipping that was unprecedented. It was. There was hundreds of ships locked outside of Long Island, or Long Beach, California. This wasn't a regular atmosphere delay, was it? This was unprecedented. It was unprecedented, but that was known and foreseen. At the point where VA put out the solicitation, it was clear with the offerors that it wanted these gloves within 45 days under the current circumstances, which were pandemic circumstances. So yes, there might have been unusual delays, but they were not unforeseeable. And as the trial court emphasized, the primary reason for delay in this case was not typical pandemic issues. It was the fact that two of the contractors decided not to provide, or at least in addition to providing gloves on hand, or instead of providing gloves on hand, they would manufacture gloves on hand after the contract was awarded, which used up a significant amount of those 45 days. They chose to solicit the gloves or to ship the gloves from overseas, which, while I don't think it clearly violates the terms of the contracts, they were not required to source gloves from overseas. That was a risk that they chose to take on. And under pandemic circumstances, choosing to source gloves from China with a strict 45-day deadline, that was a very risky decision that they chose to make. Did they provide documentation to support up the cause of the delay? Not really. So pretty much all the citations in their brief cite to emails that they sent to the VA using very generalized language about the delay. So to take some examples, servant kept mentioning the Suez Canal blockage. They have an email that says, quote, that says there were many weeks delay at ports due to Suez Canal issue. And they mentioned other extenuating global market conditions due to pandemic that are directly affecting the California port. Do you have a specific JA page that you're referring to? Yeah, so I'm looking at, I believe that's in appendix 415 through 25. That was what they cited in support of the Suez Canal issue. So these were just very general assertions with no supporting documentation that they made. Yeah, and there was another email where they said that the, quote, major reason for their excusable delay was the, quote, supply chain crisis that was caused by the pandemic without any further detail or without any supporting documentation. So the trial court recently found that based on this record, it could not support a finding that there was excusable delay. Nobody's disputing, at least with respect to the 45-day deadline, that there was no prima facie case of default. And yeah, this record would not support a finding that there was excusable delay, especially considering the risks that the plaintiffs chose to take. Can you have a situation where a solicitation is per se unreasonable? In general, yes. I imagine a solicitation could be per se unreasonable. Why wouldn't this be one of those cases? Oh, in the sense that what it's asking for is impossible to accomplish? Well, I'm not sure. Well, if the chain supply process is getting worse as we go on, and it enters a stage that's much more egregious at the beginning of a solicitation, and yet the government doesn't yield not an inch, unless, of course, it receives free product. But it doesn't yield an inch on recognizing the delay that exists and the strain that that puts on small businesses and other solicitors like these. Well, respectfully, Your Honor, none of the plaintiffs ever gave any evidence or argued really that the situation was getting worse by the day and that the situation 35, 40 days in was significantly worse than the situation at the beginning. Would that make a difference, you think? If there had been... I shouldn't ask you to guess, but... Yes, I certainly don't want to speculate as to what the contracting officer might have decided, but excusable delay requires some sort of unforeseen circumstance. So, yes, an unforeseen circumstance within the world of pandemic-related issues might have arisen. I think the closest thing here would be that AME claimed that there was a COVID outbreak at their particular port in China. Part of the reason the trial court was not sympathetic to this argument was that, again, they decided to manufacture gloves that were supposed to have been on hand. But also, the court noted that the bills of Leyden they submitted showed that even the supply that left China on time was still not supposed to make it to New York by the deadline. And frankly, that's a recurring issue. These cases involved a series of misleading and evasive communications, such that it wasn't as though it was smooth sailing up until day 44 when they said, we're so sorry, we need an extra week. They were not clear on what the updated timeline would be. They were evasive about why they were providing substitute goods. They would say that it was the same distributor and then later admit that it was a different distributor. And after the series of behavior, in all cases, the contracting officer ultimately decided to terminate for default. But the key point here is that in all cases there was prima facie default. With respect to substitution, there was no contractual requirement that the contracting officer even consider substitute gloves and with respect to the 45-day deadline, the only requirement was that the contracting officer grant an extension for excusable delays, which there was not in this case. To the extent that they're arguing that the contracting officer exercised no discretion, that's clearly not true. In several cases, the contracting officer even did attempt to negotiate and attempt to be more generous than he had initially planned to be in order to help these contractors out and to try and get the gloves that were needed for our VA facilities, but ultimately they weren't able to reach an agreement. The plaintiffs cite the request for consideration as though it's some kind of extortion when really it's no more than the law requires when plaintiffs ask a contractor to modify a contract. And finally, to the extent they argue that there's some abuse of discretion issue beyond what's been discussed so far, they would have to be able to prevail on one of the McDonnell-Douglas factors. The only one that they've made a serious argument about is the amount of discretion given to the contracting officer. The contracting officer had as much discretion here as in any case, even if he had wanted to unilaterally reduce his own discretion at the beginning of the process, he didn't have the authority to do so. Sort of by definition, this was his exercise of discretion and this simply cannot support a finding that any of the McDonnell-Douglas factors are satisfied. So in conclusion, we respectfully ask that this court uphold the decision below. Thank you. Thank you. You have 58 seconds, but we're gonna restore you to your four minute rebuttal time if to the extent we need it, okay. Thank you, Your Honor. Judge Cunningham, to circle back to your question regarding citations to the appendix on any evidence of the delays that the contractors experienced. As my opposing counsel did note, most of them were email communication. There wasn't a lot of additional evidence outside of the email communication, but the email communication is located for Servant Health at appendix 417 through 427 and 438 through 441, for AME at appendix 2251 and for Transcendence at appendix 1808. And going to your question, Judge Reyna, on was the solicitation per se unreasonable, I do think it bears reminding that according to the testimony of both the contracting officer and the contracting specialist during depositions, at no point was there any need at any particular VA facility for these gloves. These solicitations were issued because at some point the VA recognized that there were supply issues, that there were going to be shortages of gloves, so they decided to create a stockpile. A stockpile to sit in a warehouse for some unknown date when a VA facility might need the gloves. And the 45 days was only determined because a prior solicitation had included 30 days, but the contracting officer realized that there weren't sufficient offers because of probably the supply chain issues. So was it unreasonable for the contracting officer to set this arbitrary 45 day deadline without any consideration of the supply chain issues? I certainly would say so, and also in consideration with what truly were the VA's needs. They just wanted to create a stockpile at the end of the day. Is the issue of whether the solicitation created an impossible situation to perform, does that issue move or is it a long one? We don't believe so, Your Honor, because in this particular case, the solicitation essentially became the contract award itself. And then also circumstances changed after the awards were issued. In some of these instances, the time from the offer being submitted to the time that the award was issued, it was in excess of 30 days. And so when you're dealing with, again, supply chain issues, the contractors, when submitting that offer, may have preemptively lined up certain shipping channels or shipping avenues, but things changed quickly during that spring of 2021. So from the time that they submitted their offer to the time that they were issued the contract. But for example, if there was at least, I think in some instances, requests for weekly communication, so there could be regular updates for those provided to identify any concerns about delays. Yes, Your Honor. And I believe that in some of the circumstances, the contractors were relaying that information as they received it. So they were receiving information from their suppliers or from the particular shipping avenues that they had utilized saying everything is on track. I know that in AME circumstances, the second they were notified that there was a shipping delay, they immediately emailed the contracting officer. What about, and I can't remember which one this relates to, so hopefully you'll be able to clarify for me, but what about the fact that I think there was something that indicated that it was actually going to arrive at least a day after, like maybe June 8th rather than June 7th, even though the deadline was June 7th? Can you identify which one that relates to you and maybe respond to that too? Yes, Your Honor. And I know that what is in the record is, I believe it was just the subsequent notice from the shipping company. It wasn't the original bill of lading showing when it was originally supposed to arrive. So candidly, that document is not before the court, but AME upon learning that there was going to be a shipping delay, they sent the email, and that's the document that is a part of the record is that email that they received saying it's now going to arrive in New York after the time. My last question is, was there anything beyond emails that were submitted to support up the reasons that you thought you had for excusable delay? No, Your Honor. And unfortunately, what we have before this court is just the email, the communication from the contractor saying, hey, there's an issue. Candidly, the contracting officer didn't ask for more information, and that's why in AME situation, you only have that one document saying that the shipping was not going to arrive until June 9th, because the contracting officer never asked for that follow-up information regarding the delay itself. And with that, Your Honors, I do respectfully request that you reverse a little course of session. Okay, thank you very much.